**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**KEY WEST DIVISION**

**Case No.**

BRADLEY DAVIN,
Individually and All Others
Similarly Situated,
Plaintiff,
vs.

KEURIG DR PEPPER, INC.,                    **Jury Trial Demanded**
Defendant.

_____

## CLASS ACTION COMPLAINT

Plaintiff, BRADLEY DAVIN ("Plaintiff"), by and through his attorneys, brings this action individually and on behalf all others similarly situated against KEURIG DR PEPPER, INC. ("Defendant" or "Keurig" as referred to hereafter). Plaintiff hereby alleges, on information and belief, except for information based on personal knowledge, which allegations are likely to have evidentiary support after further investigation and discovery, as follows:

## INTRODUCTION

1.    Defendant markets and sells plastic single-serve coffee pods ("K-pods" or "Products") nationwide in retail stores and online stores such as Amazon.

1

Defendant deceptively labels and advertises its K-Cup single-use beverage pods as "recyclable," despite the fact that a majority of consumers are unable to recycle K-Cups. Most recycling centers in the United States do not recycle K-Cups due to their small size, irregular shape, multi-material construction, frequent contamination issues, and unfavorable economic factors.

2.      Despite these facts, Keurig promotes its K-Cup pods as "recyclable" because they are made from polypropylene #5 plastic. However, the company relies on a purely theoretical definition of recyclability that ignores the fundamental principles outlined in the FTC's Green Guides and does not align with consumer understanding. This deceptive marketing strategy allows Keurig to exploit consumer demand for environmentally responsible products.

3.      Plaintiff purchased the Products in reliance on Defendant's false representations that the Products are recyclable. Plaintiffs viewed Defendant's false representations on the labels and other marketing materials for the Products. If Plaintiffs had known that the Products were not recyclable, Plaintiffs would not have purchased the Product(s) and would have instead sought out single-serve pods or other coffee products that are otherwise compostable, recyclable, or reusable. At a minimum, Plaintiff would not have paid as much as he did if he had known the Products could not be recycled..

4.      Defendant's misrepresentations concerning the Products are unfair,

2

unlawful, and fraudulent, and have the tendency or capacity to deceive or confuse reasonable consumers. As such, Defendant's practices violate Florida's Deceptive and Unfair Trade Practices Act, § 501.201, et seq. ("FDUPTA").

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this matter under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2)(A), as the amount in controversy exceeds $5 million, exclusive of interests and costs; it is a class action of over 100 members; and the Plaintiff is a citizen of a state different from at least one Defendant.

6.      This Court has personal jurisdiction over Defendant. Defendant has sufficient minimum contacts with the state of Florida and purposefully availed themselves, and continue to avail themselves, to the jurisdiction of Florida through the privilege of conducting its business ventures in the state of Florida, thus rendering the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper in this district under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district, as Defendants do business throughout this district, and Plaintiff made their purchase of Dunkin Donuts Coffee KEURIG K-Cup single use beverage pods (the "Product(s)") in Monroe County, Florida, from a retailer in this district and the purchased the Products were delivered to, and used, in this district.

## THE PARTIES

8.      Plaintiff, Bradley Davin, is a natural person and a citizen and resident of Monroe County, Florida. Plaintiff purchased the Products from a local retailer on numerous occasions throughout the class period.

9.      He purchased the Products for his personal use within the applicable statute-of-limitations period in Monroe County, Florida. Plaintiff's most recent purchase was at a Publix Store for approximately $13.99 within the last 3 months. Prior to purchasing the Products, Plaintiff saw and read the packaging.  Plaintiff reasonably believed that the product he purchased was recyclable.  Plaintiff was not aware that the Product could not be recycled.  Had Plaintiff known that the Products were not recyclable, he would not have purchased the Products.

10.      Plaintiff would purchase the Product in the future; however, Plaintiff cannot now or in the future rely on the representations on the Product's labels because he cannot know whether the contents remain false, and he may reasonably, but incorrectly, assume the Products were improved.

11.      Defendant, Keurig Dr Pepper Inc., a food and beverage manufacturer and distributor, is incorporated in Delaware with its corporate headquarters located at 53 South Avenue, Burlington, MA 01803.

12.      Defendant has labeled, advertised, distributed, and sold the Class Products for sale at its locations in Florida during the statute of limitations period

under several of its brand names.

13.     Defendant manufactures, markets, advertises, and distributes the Products throughout the United States. Defendant created and/or authorized the false, misleading, and deceptive advertisements, packaging, and labeling of its Products.

## FACTUAL ALLEGATIONS

### A.     Background

14.     Keurig has been aware for years that consumers are increasingly concerned about the environmental impact of their consumption habits and that such concerns materially influence purchasing decisions.[1] As early as 2016, Keurig's own research showed that consumer worries about the environmental impact of K-Cup pods affected purchasing behavior, and the company publicly recognized the business risk of failing to address sustainability and recyclability concerns.[2] In public filings, Keurig warned investors that consumer focus on sustainability—particularly

---

[1] Truth in Advert., Inc., *Keurig's Deceptive "Recyclable" K-Cup Pod Campaign* 2 (Jan. 26, 2026),
https://truthinadvertising.org/wp-content/uploads/2026/01/1_26_26-Keurig-complaint-to-FTC.pdf.

Keurig Dr Pepper Inc. Form 10-K for the Year Ended December 31, 2020,
https://www.sec.gov/Archives/edgar/data/1418135/000141813521000005/kdp-20201231.htm

[2] *Id.*; Order Instituting Cease-and-Desist Proceedings, In re Keurig Dr Pepper Inc., Exchange Act Release No. 100983 (Sept. 10, 2024),
https://www.sec.gov/files/litigation/admin/2024/34-100983.pdf.

the recyclability of packaging and reduction of single-use plastics—could negatively impact sales if unmet.[3]

15.    In response, Keurig announced that it had redesigned its K-Cup pods to use polypropylene (#5) plastic instead of #7 plastic and pledged that 100 percent of its K-Cup pods would be "recyclable" by the end of 2020.[4] Keurig thereafter made recyclability a central focus of its marketing strategy, emphasizing that consumers would be able to easily identify recyclable pods through on-package messaging, recycling instructions, and the #5 symbol on the pod.[5] By 2019, Keurig assured investors that it was on track to meet its recyclability goal and represented that it had conducted extensive testing with municipal recycling facilities to validate that K-Cup pods could be effectively recycled.[6] In 2020, Keurig claimed that it had achieved this goal and that all K-Cup pods sold in the United States were recyclable.[7]

---

[3] Truth in Advert., Inc., *supra* note 1; See also Keurig Dr Pepper Inc. Form 10-K for the Year Ended December 31, 2019, https://www.sec.gov/Archives/edgar/data/1418135/000141813520000007/kdp-10kx12312019.htm

[4] *Id.* See also *Brewing Transformation: Sustainability at Keurig Green Mountain*, Keurig Green Mountain, https://www.keurigdrpepper.com/wp-content/uploads/2024/03/Keurig-Green-Mountain-Sustainability-Report-2016.pdf.

[5] *Id.*
[6] *Id.* See also Keurig Dr Pepper Inc. Form 10-K for the Year Ended December 31, 2019, https://www.sec.gov/Archives/edgar/data/1418135/000141813520000007/kdp-10kx12312019.htm.

[7] *Id.* See also Keurig Dr Pepper Inc. Form 10-K for the Year Ended December 31, 2020, https://www.sec.gov/Archives/edgar/data/1418135/000141813521000005/kdp-20201231.htm

16.     Keurig did not disclose, however, that two of the largest recycling companies in the United States—together operating more than one-third of U.S. recycling facilities—had raised serious concerns regarding the recyclability of K-Cup pods and informed Keurig that they did not intend to accept them.[8] These omissions resulted in an enforcement action by the U.S. Securities and Exchange Commission, which concluded with Keurig agreeing to a cease-and-desist order and a $1.5 million civil penalty.[9]

17.     Keurig's recyclability representations have also been the subject of prior litigation and regulatory action. Between 2018 and 2020, federal class actions alleged that Keurig misled consumers into believing K-Cup pods were recyclable; those actions were settled in 2023, with Keurig agreeing to pay $10 million and make only minor modifications to its recyclability labels.[10] Similar concerns arose internationally, and in 2022, Keurig Canada agreed to pay a $3 million penalty and modify its marketing to resolve claims by Canada's Competition Bureau regarding misleading recyclability representations.[11]

---

[8] *See* FN 1. at 3. See also Press Release, U.S. Sec. Exch. Comm'n, SEC Charges Keurig with Making Inaccurate Statements Regarding Recyclability of K-Cup Beverage Pod (Sept. 10, 2024), https://www.sec.gov/newsroom/press-releases/2024-122

[9] *Id.*; Press Release, U.S. Sec. & Exch. Comm'n, *SEC Charges Keurig with Making Inaccurate Statements Regarding Recyclability of K-Cup Beverage Pods* (Sept. 10, 2024), https://www.sec.gov/newsroom/press-releases/2024-122.

[10] Truth in Advert., Inc., *supra* note 1, at 3.

[11] Press Release, Competition Bureau Can., *Keurig Canada to Pay $3 Million Penalty to Settle*

7

18. Despite this record, Keurig has continued to market K-Cup pods as recyclable, as the demand for single-serve beverage pods continues to grow and K-Cup sales remain strong.[12]

## B. Deceptive Marketing at Issue

19. Keurig promotes the purported recyclability of its K-Cup pods across multiple channels, including product packaging, its website, online retail listings, and social media. On packaging and in digital media, Keurig prominently displays the words "Recyclable K-Cup® Pods" alongside the chasing arrows recycling symbol, often on a conspicuous green banner designed to attract consumer attention.[13]

20. Any qualifying language, such as instructions to "check locally" or disclosures that K-Cup pods are "not recycled in many communities," appears in fine print that is visually separated from the primary recyclability claim and blends into the background, making it difficult to notice or read.[14] The following are a few

---

*Recycling Claims* (Jan. 6, 2022), https://www.canada.ca/en/competition-bureau/news/2022/01/keurig-canada-to-pay-3-million-penalty-to-settle-competition-bureaus-concerns-over-coffee-pod-recycling-claims.html

[12] Truth in Advert., Inc., *supra* note 1, at 3; Coffee Pods Market Trends, Cognitive Mkt. Rsch. (2025). https://www.cognitivemarketresearch.com/articles/coffee-pods-market-trends-and-future-opportunities; Keurig Dr Pepper's Revenue by Segment https://bullfincher.io/companies/keurig-dr-pepper/revenue-by-segment

[13] Truth in Advert., Inc., *supra* note 1, at 4–8.

[14] *Id.*

8

examples:







21.     Keurig's marketing materials repeatedly convey the message that consumers can place K-Cup pods in curbside recycling bins and that the pods will be recycled.[15] A few examples:

**Keurig Sustainability Report**[16]



**Keurig Sustainability Webpage**[17]

## We Love Coffee

It's what we do. That's why all our coffee is 100% responsibly sourced[1], 100% of our K-Cup® pods are made from recyclable material[2], and why we are making more brewers with recycled plastic. And it's why we're committed to sustaining the communities involved in growing, harvesting and distributing the coffee you love.

We think of it as an ecosystem in a cup. We do it for people who love our planet, and our coffee, as much as we do – so we all can enjoy it for generations to come.

1 During 2021, COVID-19 impacts and shipping delays resulted in a very small amount conventional coffee deliveries (0.38%).
2 Check locally, not recyclable in many communities, excluding lid and coffee grounds.

---

[15] *Id.*
[16] https://www.keurigdrpepper.com/wp-content/uploads/2024/03/Keurig-Green-Mountain-Sustainability-Report-2016.pdf
[17] https://www.keurig.com/hub/sustainability

## C.   Consumers' Understanding of These Marketing Messages

22.   Consumer demand for environmentally friendly products is increasing, and a majority of U.S. consumers prefer such products and are willing to pay more for them.[18] At the same time, consumers generally lack the ability to independently verify the accuracy of environmental marketing claims at the point of purchase and therefore rely on representations made by manufacturers.[19]

23.   Research shows that reasonable consumers understand the term "recyclable," particularly when paired with the chasing arrows symbol, to mean that a product will in fact be recycled if placed in a recycling bin.[20] Experts in visual perception and consumer behavior have explained that consumers will rarely notice the asterisk accompanying the recyclability claim or even be able to read the fine-print.[21]  Most assume the symbol, along with the word "Recyclable," informs them that the Product is recyclable.[22]

---

[18] *Id. at 9*

[19] *Id.*

[20] *Id.;How Consumers Feel About and Respond to Recycling & How2Recycle: A Consumer Research Summary, GreenBlue, July 29, 2022, https://greenblue.org/2022/07/29/how-consumersfeel-about-and-respond-to-recycling-how2recycle-a-consumer-research-summary/*

[21] *Id.* at 9–10; Jeff Johnson, *Report on Consumer Perception of Recyclability Claims* (Jan. 2, 2024).

[22] *Id.*

  

24.     Keurig has highlighted its recyclable message to consumers while downplaying important qualifying instructions and disclaimers.   As a result, Keurig's marketing conveys a clear and unambiguous message to consumers that K-Cup pods will be recycled if placed in curbside recycling bins.

**D.   K-Cups are Not Typically Recycled in Reality**

**(a) Company's Own Statements**

25.     In practice, K-Cup pods are not typically recycled and overwhelmingly end up in landfills. Keurig itself implicitly acknowledges this reality by conceding that K-Cup pods are not accepted in many communities and by promoting its proprietary K-Cycle mail-back program for business customers, which requires paid shipping and specialized handling because K-Cup pods cannot be reliably recycled through ordinary curbside systems.[23]

---

[23] Truth in Advert., Inc., *supra* note 1, at 11; Keurig K-Cycle Program, https://keurigkcycle.com/.

**(b) Expert Findings on K-Cup Recyclability**

26.    To evaluate the real-world recyclability of K-Cup pods, TINA.org engaged the services of SCS Engineers, a nationally recognized environmental consulting firm that specializes in waste management solutions and recycling feasibility.[24] Between March and June 2025, SCS surveyed recycling industry representatives in major metropolitan areas across the ten most populous U.S. states, including California, Florida, Georgia, Illinois, Michigan, New York, North Carolina, Ohio, Pennsylvania, and Texas.

27.    SCS based its findings on those survey responses, a review of published industry reports, expert consultations,[25] and an analysis of state waste characterization data. SCS determined that K-Cup pods are not typically accepted for recycling in municipal recycling programs in the United States. SCS identified several factors that limit or prevent the recycling of K-Cup pods, including:

• **Size**. K-Cup pods measure approximately two inches by two inches and are frequently too small to be captured by the mechanical sorting equipment used in

---

[24] *See* SCS Engineers Report (Sept. 30, 2025), available at
https://truthinadvertising.org/wpcontent/uploads/2026/01/9_30_25-SCS-Engineers-Expert-Report.pdf

[25] SCS Engineers interviewed a Vice President of a major North American waste management company, operating 367 collection operations, 248 transfer stations and 75 recycling centers across 41 states in the U.S. and Canada; and a Solid Waste and Recycling Manager for a large city. They were asked to give SCS Engineers their insight regarding recycling operations for coffee pods. The consensus of the discussions was that the multimaterial composition, small size and contamination of coffee pods result in their frequent rejection and disposal in landfills.

13

many materials recovery facilities ("MRFs").[26] As a result, the pods frequently fall through sorting screens and are routed for disposal with residual waste rather than recovered for recycling.

- **Shape and design.** K-Cup pods consist of multiple materials, including plastic, paper filters, aluminum foil, and coffee grounds. SCS found that this multi-material design, combined with the pods' low weight and irregular shape, interferes with automated sorting systems, including optical sorters and robotic sorting equipment. Pods are frequently not emptied or disassembled by consumers, and they may break during sorting, releasing contaminants that cause the material to end up as landfill disposal.

- **Contamination.** Residual coffee grounds and liquids commonly contaminate the plastic and aluminum components of K-Cup pods. Many recycling facilities lack the ability to adequately clean or separate these materials and therefore do not accept K-Cup pods for processing.

- **Economic feasibility.** SCS found that the market value of materials recovered from K-Cup pods is generally insufficient to justify the labor or equipment costs required to process them. Facility operators reported that mixed plastics recovered from similar products often generate negative economic returns,

---

[26] MRFs are specialized plants that receive, separate and process recyclable materials to be sold as raw materials to manufacturers.

including circumstances in which operators must pay brokers to remove such material.

28.     Based on these findings, SCS concluded that municipal recycling programs serving a substantial majority of U.S. consumers—at least 60 percent—do not accept K-Cup pods for recycling and that representations describing K-Cup pods as "recyclable" do not reflect typical real-world disposal outcomes.[27] Although some recycling programs accept #5 plastic, SCS determined that K-Cup pods are generally not recyclable in practice due to the factors described above.

### (c) Recycling Facility Statements

29.     Recycling facilities, municipalities, and waste management authorities across the United States uniformly identify K-Cup pods as non-recyclable and direct them to disposal rather than recycling—even when labeled "recyclable."[28]

30.     Publicly available recycling guidance from waste management companies and local governments serving tens of millions of residents in numerous states—including California, Colorado, Connecticut, Illinois, Maryland, Massachusetts, Minnesota, Nebraska, Oregon, Pennsylvania, Texas, Vermont, and Washington—expressly instructs residents to place single-serve coffee pods, including K-Cups, in the trash.[29]

---

[27] SCS Engineers Report, *supra* note 40, at 10.

[28] Truth in Advert., Inc., *Keurig's Deceptive "Recyclable" K-Cup Pod Campaign* 11–14 (Jan. 26, 2026), https://truthinadvertising.org/wp-content/uploads/2026/01/1_26_26-Keurig-complaint-to-FTC.pdf.

[29] *Id.*; see also Casella Waste Sys., *Zero-Sort Recycling Poster* (coffee pods "NOT ACCEPTED"),

31. These sources consistently explain that K-Cup pods are rejected from recycling streams due to their small size, multi-material construction, contamination from coffee grounds and liquids, and incompatibility with automated sorting equipment.[30] Several jurisdictions further caution that recyclability labels do not reflect local acceptance and that products labeled "recyclable" may nonetheless be considered contamination.[31]

32. These facility statements corroborate the findings of SCS Engineers and confirm that, in real-world municipal recycling systems, K-Cup pods are not typically recycled.[32]

### E.   Defendant's Campaign Violates the Green Guides

33. The Federal Trade Commission's Guides for the Use of Environmental Marketing Claims ("Green Guides") provide that a product should not be marketed

---

https://www.casella.com/media/5bdbwjbi/poster-zerosort-85x11_v05.pdf; Recology, *Western Oregon Waste Zero Customer Service & Recycling Guide* (2024) (listing coffee pods as "Top Contaminants"), https://www.recology.com/wp-content/uploads/2024/01/RWO_Valley_ServiceGuides_2024.pdf; Recycle By City, *Coffee Pod Disposal Guidance*, https://www.recyclebycity.com/.

[30] Truth in Advert., Inc., *supra* note 44, at 11–14; see also SCS Eng'rs, *Expert Report on the Recyclability of K-Cup Pods* 8–10 (Sept. 30, 2025), https://truthinadvertising.org/wp-content/uploads/2026/01/9_30_25-SCS-Engineers-Expert-Report.pdf.

[31] See, e.g., City of Seattle, *Where Does It Go? – Coffee Pods* (stating coffee pods are not recyclable "even if labeled 'Recyclable'"), https://www.seattle.gov/utilities/your-services/collection-and-disposal/where-does-it-go#/item/coffee-pods; RecycleCT, *What's In / What's Out* (coffee pods considered contamination even if labeled recyclable), https://www.newingtonct.gov/2678/RecycleCT.

[32] Truth in Advert., Inc., *supra* note 44, at 11–14.

as "recyclable" unless it can be collected, separated, or otherwise recovered from the waste stream through an established recycling program for reuse or use in manufacturing.[33] The Green Guides further state that unqualified recyclable claims are appropriate only where recycling facilities are available to a substantial majority of consumers, defined as at least 60 percent.[34]

34.     As described above, SCS Engineers determined that municipal recycling programs serving at least 60 percent of U.S. consumers do not accept K-Cup pods for recycling.[35] The Green Guides also caution that a recyclable claim is deceptive where a product is made from recyclable material but, due to its size, shape, or other attributes, is not accepted in recycling programs.[36] K-Cup pods exhibit these characteristics.

35.     Keurig includes qualifying language on K-Cup packaging and other marketing materials—such as instructions to "check locally" and statements that the pods are "not recycled in many communities"—but these disclosures do not clearly convey the limited recyclability of K-Cup pods. The qualifying statements appear in

---

[33] Guides for the Use of Env't Mktg. Claims, 16 C.F.R. § 260.12(a) (2012), https://www.ftc.gov/sites/default/files/documents/federal_register_notices/guides-use-environmental-marketing-claims-green-guides/greenguidesfrn.pdf.

[34] *Id.* § 260.12(b).

[35] Truth in Advert., Inc., *Keurig's Deceptive "Recyclable" K-Cup Pod Campaign* 10–12 (Jan. 26, 2026), https://truthinadvertising.org/wp-content/uploads/2026/01/1_26_26-Keurig-complaint-to-FTC.pdf.

[36] 16 C.F.R. § 260.12(d).

fine print that is visually separated from the primary recyclability claim and is unlikely to be noticed in the context of routine, low-cost purchasing decisions.[37]

36.     The Green Guides further advise that vague or general qualifications may be insufficient where recycling availability is limited.[38] Instructions to "check locally" do not inform consumers whether K-Cup pods are accepted in their communities and may lead consumers to incorrect conclusions where local programs accept #5 plastic generally, but not K-Cup pods specifically.[39] In addition, SCS Engineers found that many municipalities and recycling facilities do not readily provide item-specific recyclability information.[40]

37.     Similarly, statements that K-Cup pods are not recycled in "many communities" do not convey the scope of the nationwide limitations on their recyclability or provide meaningful guidance to consumers.[41] The Green Guides explain that, where recycling facilities are available only to a few consumers, marketers should use more explicit disclosures indicating that recyclability is limited to a small number of communities.[42]

---

[37] Truth in Advert., Inc., *supra* note 32, at 4–8; Jeff Johnson, *Report on Consumer Perception of Recyclability Claims* (Jan. 2, 2024).

[38] 16 C.F.R. § 260.12(b).

[39] Expert Declaration of Thomas J. Maronick ¶ 13 (Dec. 17, 2019), cited in Truth in Advert., Inc., *supra* note 32, at 15.

[40] Truth in Advert., Inc., *supra* note 32, at 15–16.

[41] *Id.* at 14–16.

[42] 16 C.F.R. § 260.12(b).

**F.      FED. R. CIV. P. 9(b) ALLEGATIONS**

38.     Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.   Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." To the extent necessary, as detailed in the paragraphs above and below, Plaintiff has satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity.

(a)     **WHO:** Defendant Keurig Dr Pepper, Inc.

(b)     **WHAT:** Defendant's conduct was, and continues to be, deceptive because it is deceiving consumers into believing that the Products are recyclable when the Products are not recyclable. Defendant failed to accurately inform Plaintiff that the Product was not recyclable. Defendant knew or should have known, as the manufacturer and marketer of the Products with superior knowledge of the composition of its Products, that this information is material to reasonable consumers. Yet Defendant misrepresented, on the labeling and advertising of its Products, that the Products were recyclable. Defendant knew or should have known that the Product was not recyclable because Defendant is the manufacturer of the Product and has quality control testing protocols set in place that should have alerted Defendant to the lacking nature of the Product's recyclability.

(c)     **WHEN:** Defendant engaged in this deceptive conduct continuously throughout the applicable statutory periods, including at the point of sale. Defendant's false and misleading recyclability representations were printed prominently on the front of the Product's packaging conspicuously for consumers to view and rely on.

(d)     **WHERE:** Defendant's misrepresentations were made on the Product's label on the front package and were thus viewed by every purchaser, including Plaintiff, at the point of sale in every transaction. The Products are sold in brick-and-mortar stores and online in Florida and nationwide. Defendant's failed obligations occurred in Defendant's manufacturing facilities.

(e)     **HOW:** Defendant misrepresented on the Products' label that the K-Cups were recyclable when they are not. And as discussed in detail throughout the Complaint, Plaintiff and Class Members read and relied on Defendant's misrepresentations regarding the Product's recyclability before purchasing the Products and in choosing to purchase the Products.

(f)     **WHY:** Defendant misrepresented the recyclability of its Products. These representations were material because they induced consumers like Plaintiff to purchase the Products for their purported environmental benefits while charging a price premium. Accordingly, due to the recyclability representations, Plaintiff and Class Members paid a price premium for the Products that they would not have, or

would have paid substantially less for, had the Products not been, or risked not being, deficient in their protein composition, contrary to Defendant's express representations. As such, Defendant unlawfully profited by selling the Products to thousands of consumers throughout the nation, including Plaintiff and the Class Members.

(g)   **INJURY:** Plaintiff and Class Members were injured by Defendant's conduct in that they would not have purchased Defendant's Products or would not have purchased them on the same terms, had they known that Defendant's Products were not recyclable.

## CLASS ACTION ALLEGATIONS

39.   **Class Definition:** Plaintiff brings this action individually and as a representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and 23(b)(3), on behalf of herself and the members of the following proposed multi-state class and, in the alternative, a Florida state sub-class (the "Class" or Classes"):

(a)   **Multi-State Consumer Protection Class:** During the fullest period allowed by law, all persons who purchased the Keurig Dr Pepper single-use K-Cup Products in the State of Florida or any state with similar laws, within the applicable statute of limitations[43] for personal use and not for resale, through the date notice of

---

[43] Plaintiff asserts that the other states with similar consumer fraud laws under the facts of this case

class certification is disseminated. Excluded from the Class are: (1) Defendant and all directors, officers, employees, partners, principals, shareholders, and agents of Defendant; (2) Any currently sitting United States District Court Judge or Justice, and the current spouse and all persons within the third-degree of consanguinity to such judge/justice; and (3) Class Counsel.

  **(b)**  **Florida Sub-Class:** All individual residents of the State of Florida who purchased the Keurig Dr Pepper single-use K-Cup Products through the date notice of class certification is disseminated. Excluded from the Class are: (1) Defendant and all directors, officers, employees, partners, principals, shareholders, and agents of Defendant; (2) Any currently sitting United States District Court Judge or Justice, and the current spouse and all other persons within the third-degree of consanguinity to such judge/justice; and (3) Class Counsel.

---

include but are not limited to: Alaska (AS §§ 45.50.471, *et seq*.), Arkansas (Ark. Code §§ 4-88-101, *et seq*.), California (Cal. Bus. & Prof. Code §§ 17200, *et seq*.), Connecticut (Conn. Gen. Stat. §§ 42-110, *et seq*), Delaware (Del. Code tit. 6, §§ 2511, *et seq*.), District of Columbia (D.C. Code §§ 28-3901, *et seq*.), Florida (Fla. Stat. §§ 501.201, *et seq*.), Hawaii (Haw. Rev. Stat. §§ 480-1, *et seq*.), Illinois (815 ICLS §§ 501/1, *et seq*.), Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq*.), Michigan (Mich. Comp. Law § 445.901, *et seq*.), Minnesota (Minn. Stat. §§ 325F.67, *et seq*.), Missouri (Mo. Rev. Stat. §§ 407.010, *et seq*.), New Jersey (N.J. Stat. §§ 56:8-1, *et seq*.), New York (N.Y. Gen. Bus. Law. §§ 349, *et seq*. and §§ 350, *et seq*.), Rhode Island (R.I. Gen. Laws §§ 6-13.1-1, *et seq*.), Vermont (Vt. Stat. tit. 9, §§ 2451, *et seq*.), Washington (Wash. Rev. Code §§ 19.86.010, *et seq*.), and Wisconsin (Wis. Stat. §§ 100.18, *et seq*.). *See Langan v. Johnson & Johnson Consumer Companies, Inc*., 897 F.3d 88, 96 (2d Cir. 2018); *Mancuso v. RFA Brands, LLC*, 454 F. Supp. 3d 197, 201, 204 (W.D.N.Y. 2020); *see also Benson v. Newell Brands, Inc.*, No. 19 C 6836, 2021 WL 5321510, *9-10 (N.D. Ill. Nov. 16, 2021) (certifying a similar multi-state consumer protection class).

40. Plaintiff reserves the right to amend the Class definitions if further investigation and discovery indicate that the Class definitions should be narrowed, expanded, or otherwise modified.

41. **Numerosity and Ascertainability:** Plaintiff does not know the exact number of members of the putative classes. Due to Plaintiff's initial investigation, however, Plaintiff is informed and believes that the total number of Class members is at least in the tens of thousands, and that members of the Class are numerous and geographically dispersed throughout the United States and Florida. While the exact number and identities of the Class members are unknown at this time, such information can be ascertained through appropriate investigation and discovery, including Defendant's records, either manually or through computerized searches.

42. **Typicality and Adequacy:** Plaintiff's claims are typical of those of the proposed Class, and Plaintiff will fairly and adequately represent and protect the interests of the proposed Class. Plaintiff does not have any interests that are antagonistic to those of the proposed Class. Plaintiff has retained counsel competent and experienced in the prosecution of this type of litigation.

43. **Commonality:** The questions of law and fact common to the Class members, some of which are set out below, predominate over any questions affecting only individual Class members:

    a. whether Defendant advertises and markets the Product as recylable;

23

b.  whether the Products are recyclable

c.  whether Defendant's conduct constitutes the violations of laws alleged herein;

d.  whether Defendant's labeling, sale and advertising set herein are unlawful, untrue, or are misleading, or likely to deceive a reasonable consumer;

e.  whether the Defendant knows the Products cannot be recycled

f.  whether Defendant knew or should have known that the representations were false or misleading;

g.  whether Defendant's representations regarding the recyclability of the Products are in compliance with the Green Guides;

h.  whether Defendant knowingly concealed or misrepresented material facts for the purpose of inducing consumers into spending money on the Product;

i.  whether Defendant's representations, concealments and non-disclosures concerning the Product are likely to deceive the consumer;

j.  whether Defendant's representations, concealments and non-disclosures concerning the Product violate the Florida Deceptive and Unfair Trade Practices Act;

k.  whether Defendant's claims regarding the recyclability of the Products

24

are material to a reasonable consumer of the Products;

l.   whether Plaintiff and the Class are entitled to restitution and damages.

44.   **Predominance and Superiority:** Common questions, some of which are set out above, predominate over any questions affecting only individual Class members. A class action is the superior method for the fair and just adjudication of this controversy. The expense and burden of individual suits make it impossible and impracticable for members of the proposed Class to prosecute their claims individually, and they multiply the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a.   given the complexity of issues involved in this action and the expense of litigating the claims, few, if any, Class members could afford to seek legal redress individually for the wrongs that Defendant committed against them, and absent Class

members have no substantial interest in individually controlling the prosecution of individual actions;

b.      when Defendant's liability has been adjudicated, claims of all Class members can be determined by the Court;

c.      this action will cause an orderly and expeditious administration of the Class claims and foster economies of time, effort and expense, and ensure uniformity of decisions; and

d.      without a class action, many Class members would continue to suffer injury, and Defendant's violations of law will continue without redress while Defendant continues to reap and retain the substantial proceeds of their wrongful conduct.

45.      **Manageability:** The trial and litigation of Plaintiff's and the proposed Class claims are manageable. Defendant has acted and refused to act on grounds generally applicable to the Class, making appropriate final relief with respect to the Class as a whole.

## COUNT I

**For Violations of Florida's Deceptive
and Unfair Trade Practices Act,
Fla. Stat. 501.201 et seq.
(On Behalf of Plaintiff individually and the Florida Sub-Class)**

46.     Plaintiff realleges and incorporates by reference each of the allegations contained in the paragraphs 14-37 above as if fully set forth herein.

47.     Plaintiff brings this claim on her own behalf and on behalf of each member of the Class and Sub Class.

48.     Defendant violated and continues to violate Florida's Deceptive and Unfair Trade Practices Act by engaging in unfair methods of competition, unconscionable acts and practices, and unfair and deceptive acts and practices in the conduct of their business.

49.     The material misstatements and omissions alleged herein constitute deceptive and unfair trade practices, in that they were intended to and did deceive Plaintiff and the general public into believing that Defendant's Product is recyclable when it is not.

50.     Plaintiff and Class members relied upon these advertisements in deciding to purchase the Product.  Plaintiff's reliance was reasonable because of Defendant's reputation as a reliable company.

51.     Had Plaintiff known that the Product was not as advertised, he would not have purchased it. As a result of Defendant's deceptive and unfair acts, Plaintiff and Class members have been damaged.

52.     Defendant's conduct offends established public policy, and is immoral, unethical, oppressive, and unscrupulous to consumers.

53.     Plaintiff and Class members are entitled to damages in an amount to be proven at trial.

54.     Defendant should also be ordered to engage in a corrective advertising campaign to inform consumers that its Product is not of the quality advertised.

## COUNT II
## VIOLATION OF STATE CONSUMER PROTECTION STATUTES
### (On Behalf of Plaintiff, individually, and on
### On Behalf of the Multi-State Consumer Protection Class)

55.     Plaintiff realleges and incorporates by reference each of the allegations contained in the paragraphs 14-37 above as if fully set forth herein.

56.     Plaintiff and the Multi-State Consumer Protection Class Members were injured as a result of Defendant's violations of the state consumer protection statutes listed in paragraph 39, footnote 43, above. These state consumer protection statutes provide a basis for redress to Plaintiff and the Multi-State Consumer Protection Class based on Defendant's fraudulent, deceptive, unfair, and unconscionable acts, practices and conduct.

28

57. Defendant's conduct, as alleged herein, violates the consumer protection, unfair trade practices, and deceptive laws of each of the jurisdictions encompassing the Multi-State Consumer Protection Class.

58. Defendant's marketing of the Products violates these prohibitions by deceiving consumers into believing that the Products contain more protein than they actually do.

59. Defendant engaged in fraudulent and/or deceptive conduct that creates the likelihood of confusion or misunderstanding in violation of applicable law.

60. Specifically, Defendant advertised in a misleading and deceptive manner that the Products were recyclable. Defendant chose to package, label, and market the Product in this way to impact consumer choices, extract price premiums and gain market dominance, as it is aware that all reasonable consumers who purchase the Products would be impacted by, and would reasonably believe, its false and misleading representations.

61. Defendant intended for Plaintiff and Multi-State Consumer Protection Class Members to reasonably rely upon the material misrepresentations concerning the true nature of the Products.

62. Defendant's misrepresentations and other deceptive conduct were likely to deceive and cause misunderstanding and/or, in fact, did cause Plaintiff and

29

Multi-State Consumer Protection Class Members to be deceived about the true nature of the Products.

63.    As a direct and proximate result of Defendant's misrepresentations, Plaintiff and Multi-State Consumer Protection Class Members suffered ascertainable losses.

64.    Had they been aware of the true nature of the Products, Plaintiff and Multi-State Consumer Protection Class Members either would have paid less for the Products or would not have made the purchases at all.

65.    Pursuant to the aforementioned states' unfair and deceptive practices laws, Plaintiff and Multi-State Consumer Protection Class Members are entitled to recover compensatory, restitution, punitive, and special damages, including, but not limited to treble damages, reasonable attorneys' fees and costs, and other injunctive or declaratory relief as deemed appropriate or permitted by relevant law.

## COUNT III

### Fraud

### (On Behalf of Florida and Multi-State Class)

66.    Plaintiff realleges and incorporates by reference each of the allegations contained in the paragraphs 14-37 above as if fully set forth herein.

67.    Defendant knowingly made material misrepresentations and omissions regarding the Products on the Products' labeling and packaging in the Products'

advertisements, and/or on its website, specifically the "Recycling" representations and omissions alleged more fully herein.

68. Defendant made these material "Recycling" representations and omissions in order to induce Plaintiff and putative Multi-State Class Members to purchase the Products.

69. Defendants knew the "Recycling" representations and omissions regarding the Products were false and misleading, but nevertheless made such representations through the marketing, advertising, and on the Products' labeling.

70. In reliance on these "Recycling" representations and omissions, Plaintiff and putative Class Members were induced to, and did, pay monies to purchase the Products.

71. Had Plaintiff and the Class known the truth about the Products, they would not have purchased the Products.

72. As a proximate result of the fraudulent conduct of Defendant, Plaintiff and the putative Class paid monies to Defendant, through their regular retail sales channels, to which Defendants are not entitled, and have been damagedin an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays this Court:

a.      Certify this action as a class action;

b.      Award compensatory, statutory, and punitive damages as to all Counts where such relief is permitted by law;

c.      Order Defendant to engage in a corrective advertising and labeling/disclosure campaign;

d.      Award equitable monetary relief, including restitution or refund;

e.      Award pre-judgment and post-judgment interest at the legal rate;

f.      Award Plaintiff and Class members the costs of this action, including reasonable attorneys' fees, costs, and expenses; and

g.      Award such other and further legal and equitable relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.


DATED: January 29, 2026

s/William C. Wright
WILLIAM WRIGHT
The Wright Law Office
FL Bar No. 138861
515 N. Flagler Drive, Suite 350
West Palm Beach, FL 33401
Telephone: (561) 514-0904
willwright@wrightlawoffice.com